Filed 9/19/13  P. v. Mills CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JACK MILLS,<br><br>    Defendant and Appellant. | 2d Crim. No. B243378<br>(Super. Ct. No. 1331307)<br>(Santa Barbara County) |

Jack Mills held a gun to the head of Maria Aguilar and shot Juan Ortiz Aguilar during a botched home-invasion robbery.  A jury found him guilty of the attempted murder of Juan Ortiz Aguilar (Pen. Code, §§ 187, 664),[1] two counts of assault with a firearm (§ 245, subd. (a)(2)), two counts of attempted second degree robbery (§§ 211, 664), first degree burglary (§ 459), and possession of a firearm by a felon. (§ 12021, subd. (a)(1).)  The jury also found true numerous sentence enhancement allegations relating to appellant's use of a firearm and infliction of great bodily injury.  As we will explain in greater detail below, the trial court sentenced appellant, a third-strike offender, to 59 years to life for the attempted murder, a consecutive term of 35 years to life for the assault with a firearm on Maria Aguilar, and a consecutive term of 53 years to life for the attempted robbery of Maria Aguilar.  Concurrent terms of 35 years to life and

---

[1] All statutory references are to the Penal Code unless otherwise stated.

1

28 years to life were imposed for the assault with a firearm on, and the attempted robbery of  Juan Aguilar.  Terms imposed for the burglary and firearm possession were stayed pursuant to section 654.

Appellant contends the trial court erred when it imposed consecutive terms for the assault with a firearm on and attempted robbery of Maria Aguilar, when it failed to stay pursuant to section 654 the terms imposed for the assault with a firearm on and attempted robbery of Juan Aguilar, and when it calculated the sentence for the attempted murder of Juan Aguilar.  He further contends the prosecutor committed misconduct in his closing argument at trial because he impugned the character of appellant's trial counsel.  Finally, appellant contends there is no substantial evidence that he acted with the specific intent to rob either victim.  We stay the terms imposed for the assault with a firearm on Maria Aguilar and those imposed for the assault with a firearm on and attempted robbery of Juan Aguilar pursuant to section 654 and re-calculate the term imposed for the attempted murder.  In all other respects, the judgment is affirmed.

*Facts*

Maria Ramirez Aguilar lived in a Santa Barbara house with her adult children, Herson and Joanna, her nephew, Juan Ortiz Aguilar, and other relatives.  One Saturday, appellant and a woman came to the house and asked Maria whether she had a room for rent.  On Sunday, Maria held a garage sale.  That Monday morning, she was in her kitchen when she noticed appellant and the same woman again standing inside her house near the front door.  Appellant was wearing a blue cap and holding a newspaper.  Gesturing with the newspaper, he again asked Maria about a room for rent.  She walked closer to him, to see what was in the newspaper.  A third man, who was Black and younger than appellant, appeared and stood behind the woman.  Appellant grabbed Maria by the throat and put a gun to her head.  As she started to faint, Maria could hear appellant cursing at her.  The sound of a gunshot revived her.  Maria was on the floor with appellant on top of her.  When she looked up, she could see her nephew, Juan Aguilar, lying on the floor nearby in a pool of blood.  He had been shot in the forehead.

2

The intruders left the house. Maria cradled Juan's head in her lap while her son Herson called 911.

Juan was in the bathroom when he heard his aunt arguing with someone in English. He ran out and saw a man with his left forearm around Maria's neck, pointing a gun at her right temple. Juan jumped toward them, hitting the man in the face with his left forearm. The man and Maria fell to the floor. As the man struggled to get up, he pointed the gun at Juan's chest. They struggled over the gun. Juan heard a shot. He felt something hit his forehead and then drifted in and out of consciousness.

Herson Aguilar heard a commotion in the living room while he was in his bedroom, folding laundry. When he got there, he saw his mother lying on the floor and his cousin Juan fighting with appellant. Herson heard the shot and saw Juan fall down, but he did not see the gun. He believed the shot came from appellant firing at close range. After Juan fell down, the Black man pointed a gun at Herson. Herson ran back down the hallway to his bedroom and jumped out his bedroom window. As he ran around the house, toward the front door, Herson saw appellant, a woman and two Black men driving away in a black Volvo. He called 911 and gave a description of both the Volvo and the people inside it.

Earlier that morning, Herson had been outside, working in the front yard. He noticed appellant and a Black man loitering near his home. Herson recognized appellant as the man who was fighting with Juan. He also recognized the Black man as appellant's companion from earlier that morning.

Sajan Chhetri, a neighbor of the Aguilar family, testified that, about four days before the assault, two men knocked on his door and claimed to be from the gas company. One of the men was older and white, like appellant; the other was younger and Black. The men asked to check Chhetri's gas meter. Even though they were not wearing coveralls and did not have gas company identification, Chhetri showed them where the meter was located. The men did not look at it. Instead, they took the opportunity to look over the fence toward Maria Aguilar's house and back yard.

Eduardo Trujillo, who lived near the Aguilars on Arrellaga Street, told police that, on the morning of the attack, he noticed a black, four-door Volvo parked on the street in front of his next-door neighbor's house. A White woman was sitting in the driver's seat and an older White man was sitting in the front passenger seat. Two younger, dark-skinned men were sitting in the back. They asked Trujillo directions to the 700 block of Arrellaga Street. He told him they had already passed the 700 block. The Volvo drove toward that intersection and then turned on Gillespie Street, where the Aguilars' house is located. Because Trujillo was suspicious, he wrote down the first two symbols from the Volvo's license plate: 3F.

Following up on a tip from a citizen informant, Santa Barbara police obtained surveillance video from a Santa Barbara gas station that was taken the day before the incident. The video shows appellant, a woman and two younger Black men at the gas station. Appellant was shown wearing a blue cap like the one Maria Aguilar described him wearing during the incident. A police officer found a similar cap on the floor in the Aguilars' living room, near the site of the struggle between appellant and Juan. The cap did not belong to anyone in the Aguilar family. Maria identified appellant from the video as the man who attacked her. She also identified the woman he was with and one of the other men as having been in her home when the attack occurred. Herson identified the car they were using as the black Volvo he had seen speeding away from the house that morning.

About 10 days after he was shot, Juan identified appellant from a photographic line up. Herson identified two photographs as possibly being of the suspect. One of these was a photograph of appellant. Maria was unable to identify anyone from the still photographs, although she did identify appellant from the surveillance video.

In response to a request for assistance from the Santa Barbara police department, an officer in Lompoc watched the surveillance video. That officer identified appellant and Rebecca Mills because she had known them for several years. Santa Barbara police officers then used appellant's name to locate him at his residence in

4

Nevada. When they arrived at the Nevada address, they found appellant sitting in a black four-door Volvo with license plate number 3FLB429. The car matched the descriptions given by Herson and Trujillo. Appellant was the major contributor of DNA found on the hat left in the Aguilars' living room after the incident.

*Verdict and Sentence*

The jury found appellant guilty of the following offenses: count 1. attempted willful, deliberate and premeditated murder of Juan Ortiz Aguilar; count 2. assault with a firearm on Maria Aguilar; count 3. assault with a firearm on Juan Ortiz Aguilar; count 4. attempted second degree robbery of Maria Aguilar; count 5. attempted second degree robbery of Juan Ortiz Aguilar; count 6. possession of a firearm by a person who has suffered three prior felony convictions; and count 7. first degree burglary. The jury found that a principal was armed with a firearm in the commission of counts 1, 4, 5 and 7. (§ 12022, subd. (a)(1).) It found that appellant personally used a firearm while committing counts 1, 2, 3, 4 and 5. (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a)(1).) With respect to counts 1, 4 and 5, the jury found that appellant personally discharged a firearm causing great bodily injury to Juan Ortiz Aguilar. (§ 12022.53, subd. (d).) With respect to counts 1, 3, 5 and 7, the jury found that appellant personally inflicted great bodily injury on Juan Ortiz Aguilar. (§ 12022.7, subd. (c).) Each offense, other than the firearm possession offense alleged in count 6, was alleged to be a serious and/or violent felony within the meaning of sections 667.5 and 1192.7. In a bifurcated proceeding, the trial court further found that appellant had suffered two prior "strike" convictions of robbery, in 1977 and 1981. The allegation that appellant had served a prior prison term in connection with a 1990 conviction of receiving stolen property (§ 496), was dismissed.

The trial court imposed the following sentence. On count 1, it imposed a sentence of 34 years to life for the attempted murder, plus 25 years to life for the section 12022.53, subdivision (d) enhancement (causing great bodily injury by personally discharging a firearm). On count 2, it imposed a term of 25 years to life plus 10 years for the section 12022.5, subdivision (a)(1) enhancement (personal use of a firearm). On count 4, the trial court imposed a term of 28 years to life for the attempted robbery, plus

5

25 years to life for the section 12022.53, subdivision (d) enhancement. The sentences imposed on counts 1, 2 and 4 were ordered to run consecutively. The trial court imposed concurrent terms of 35 years to life on count 3 and 28 years to life on count 5. It stayed the terms imposed on counts 6 and 7 pursuant to section 654.

*Contentions*

Appellant contends his convictions of attempted robbery should be reversed because there is no substantial evidence he intended to rob Maria and Juan. He contends the prosecutor committed misconduct in closing arguments because he disparaged the integrity of appellant's trial counsel. Appellant also challenges the sentence imposed by the trial court. He contends the trial court erred when it imposed consecutive terms on counts 2 and 4, the assault with a firearm on, and attempted robbery of Maria Aguilar, because these offenses were part of an indivisible course of conduct. One of the terms, he contends, should be stayed pursuant to section 654. Appellant next contends the concurrent terms imposed on counts 3 and 5 were unauthorized and that both terms should be stayed pursuant to section 654. His final sentencing claim is that the trial court erred when it calculated the term imposed on count 1 for attempted murder because it made dual use of a single enhancement and incorrectly determined the base term for the offense.

*Discussion*

*Substantial Evidence*

Appellant contends there is no substantial evidence that he intended to rob the victims, so his convictions of attempted robbery (counts 4 and 5) must be reversed. We are not persuaded.

In evaluating this contention, we apply familiar standards: we ask whether the record, considered as a whole and in the light most favorable to the judgment, contains reasonable, credible evidence of solid value upon which a reasonable trier of fact could rely to find the defendant guilty beyond a reasonable doubt. (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052; *People v. Silva* (2001) 25 Cal.4th 345, 368.) We presume in support of the judgment the existence of every fact the jury could reasonably deduce

6

from the evidence. We may not re-weigh the evidence or second-guess the jury's credibility determinations. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) In addition, we accept all logical inferences the jury might have drawn from the circumstantial evidence and resolve all evidentiary conflicts in favor of the judgment. (*People v. Maury* (2003) 30 Cal.4th 342, 396; *People v. Poe* (1999) 74 Cal.App.4th 826, 830.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

There was substantial evidence from which a reasonable jury could infer that appellant entered the Aguilar home with the intent to rob its inhabitants. First, there was evidence that appellant and his accomplices engaged in extensive planning and surveillance before they invaded the Aguilar house. Four days before the incident, appellant and an accomplice impersonated gas company employees and convinced a neighbor they needed to check the gas meter for a leak. Instead, the two men used the opportunity to look into the Aguilars' back yard. Two days before the incident, appellant and his wife went to the house under the pretext that they were looking for a room to rent. On the morning of the attack, another neighbor saw appellant and his accomplices in the black Volvo, parked on a street near the Aguilar house. That same morning, Herson saw appellant and one of his accomplices pretend to be drunk as they walked past the house. When appellant next entered the house, he again used the ruse that he was looking for a room to rent so he could get close enough to Maria to grab her. A reasonable jury could infer from this evidence of planning and surveillance that appellant and his accomplices were "casing" the Aguilar house prior to robbing it.

Second, the circumstances of the home invasion itself support a reasonable inference that appellant entered the house with the intent to rob its inhabitants. Appellant was armed and had accomplices with him. There is no evidence that he had a relationship with any resident of the house and therefore no basis for inferring that he was there to avenge an insult or exact revenge. As soon as he got Maria within arm's reach, appellant immediately grabbed her and put his gun to her head. Juan testified that he

7

believed appellant was there to rob the house because there was no other reason for him to be threatening people. The jury could reasonably have drawn the same inference.

### Prosecutorial Misconduct

Appellant contends the prosecutor committed misconduct during his rebuttal argument when he suggested that defense counsel was trying the confuse the jury by overstating the importance of slight contradictions in the witness' statements. The contention has been forfeited because appellant did not object to any of the prosecutor's statements in the trial court. (*People v. Seaton* (2001) 26 Cal.4th 598, 682; *People v. Fierro* (1991) 1 Cal.4th 173, 212.)

Had the contention not been forfeited, we would reject it. In his closing argument, defense counsel encouraged the jury to be skeptical of each eye witness' identification, arguing none of the witnesses could reliably identify appellant as the person with the gun. The prosecutor rebutted that argument by contending that defense counsel was over-stating the importance of small inconsistencies in the witnesses' testimony. His rebuttal argument did not impugn the integrity of defense counsel or use "deceptive or reprehensible methods" to persuade the jury. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1072.) There was no misconduct. For the same reason, defense counsel was not ineffective for failing to object to the rebuttal argument. (*People v. Boyette* (2002) 29 Cal.4th 381, 424; *People v. Price* (1991) 1 Cal.4th 324, 387.)

### Sentencing Issues

#### Assault With a Firearm on, and Attempted Robbery of Maria Aguilar

Appellant contends the trial court erred in imposing separate consecutive terms for the assault with a firearm on, and attempted robbery of Maria Aguilar, counts 2 and 4 . Because these offenses were part of an indivisible course of conduct, he contends, multiple punishment is barred by section 654. We agree.

Section 654 subdivision (a) provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." " The statute precludes multiple

8

punishments for a single act or indivisible course of conduct. (*People v. Hester* (2000) 22 Cal.4th 290, 294.) "It is defendant's intent and objective, not the temporal proximity of his offenses, which determine whether the transaction is indivisible. [Citations.] We have traditionally observed that if all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once." (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) By contrast, where the defendant has more than one criminal objective and these objectives are not "merely incidental to each other," he may be separately punished for each statutory violation committed to further each objective. (*Id.* at p. 335.)

As a general rule, when an assault is committed to facilitate a robbery, section 654 prohibits separate punishments for both offenses. (*People v. Miller* (1977) 18 Cal.3d 873, 886, disapproved on other grounds, *People v. Oates* (2004) 32 Cal.4th 1048, 1067-1068, fn. 8; *People v. Martinez* (1985) 171 Cal.App.3d 727, 736.) However, when the assault is a "gratuitous" act of violence that does not facilitate the robbery, it "has traditionally been viewed as not 'incidental' to robbery for purposes of Penal Code section 654[,]" and may be punished separately. (*People v. Nguyen* (1988) 204 Cal.App.3d 181, 190.)

Respondent contends appellant was properly sentenced separately for the assault and the attempted robbery because Maria was not resisting and he "gratuitously" put the gun to her head. We are not convinced. There is no evidence appellant entered the Aguilar house for the purpose of assaulting Maria or any other resident. To the contrary, the only reasonable inference to be drawn from the evidence is that appellant came to the house for the purpose of robbing the occupants. As Maria described the incident, appellant grabbed her neck and immediately put the gun to her head. The gun was the "force or fear" through which appellant attempted to take Maria's property. (§ 211.)

This is not a case where the robber commits an assault only after taking the victim's property. In those cases, section 654 does not prohibit separate punishments for

both the assault and the robbery. For example, in *People v. Nguyen, supra,* one defendant emptied a convenience store cash register while his accomplice took the store's clerk "into a back room, relieved him of his valuables, and then forced him to lie on the floor in an obvious attempt to forestall any resistance. Only after the clerk assumed that position did [the second robber] shoot him. [¶] This act constituted an example of gratuitous violence against a helpless and unresisting victim which has traditionally been viewed as not 'incidental' to robbery for purposes of Penal Code section 654." (*People v. Nguyen, supra,* 204 Cal.App.3d at p 190.)

By contrast, in *People v. Miller, supra,* Miller and an accomplice entered a jewelry store to rob it. Miller shot the security guard, while the accomplice told the salesperson to lie down on the floor and then took jewelry from the display cases. Our Supreme Court held section 654 did not preclude the imposition of separate punishments for the burglary and robbery, because the burglary was a crime of violence against the security guard and the robbery was committed against the salesperson. "Section 654 does, however, preclude the imposition of sentence as to the assault conviction. That crime was committed during the same course of conduct and against the same victim as in the case of the aggravated burglary conviction and defendant cannot be punished for both of those convictions." (*Id.* 18 Cal.3d at p. 886; see also *People v. Latimer* (1993) 5 Cal.4th 1203, 1216-1217 [section 654 bars separate punishments for kidnapping and rape where the kidnapping was committed to accomplish the rape]; *People v. Flowers* (1982) 132 Cal.App.3d 584, 587-588 [section 654 bars separate terms for assault and robbery where "the assault was to perfect the robbery . . . ."].)

In our view, this case is more like *Miller* than *Nguyen.* Appellant's use of the gun with Maria was not a whim or an afterthought to the attempted robbery; it was appellant's means of accomplishing the robbery. Because the offenses against Maria were part of the same course of conduct, section 654 precludes separate punishment for both offenses.

10

*Assault With a Firearm on, and Attempted Robbery of Juan Ortiz Aguilar*

Appellant contends the trial court erred when it imposed concurrent terms on counts 3 and 5, for the assault with a firearm on and attempted robbery of Juan Ortiz Aguilar. Respondent correctly concedes the point. As we noted above, section 654 prohibits "multiple punishments for a single act or indivisible course of conduct." (*People v. Miller, supra,* 18 Cal.3d at p. 885.) In addition, where multiple offenses are committed "incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*People v. Latimer, supra,* 5 Cal.4th at p. 1208.) Here, appellant's intent in committing the assault against Juan Aguilar (count 3) appears to have been the same as his intent in committing the attempted murder (count 1): to facilitate appellant's attempted robbery of the same victim (count 5). Because these offenses were part of a single course of conduct and were committed incident to a single objective, section 654 prohibits separate punishments for the assault with a firearm and attempted robbery. The sentences on counts 3 and 5 must be stayed. (See, *People v. Miller, supra,* 18 Cal.3d at p. 886; *People v. Ridley* (1965) 63 Cal.2d 671,678.)

*Sentence for Attempted Murder*

Appellant contends the sentence imposed on count 1 for attempted murder was unauthorized because it made dual use of the section 12022.53, subdivision (d) enhancement and because it incorrectly calculated the minimum parole eligibility date for attempted premeditated murder. We agree only with the latter contention.

Section 664, subdivision (a) provides: "[I]f the crime attempted is willful, deliberate, and premeditated murder, as defined in Section 189, the person guilty of that attempt shall be punished by imprisonment in the state prison for life with the possibility of parole." Section 3046 provides that seven years is the minimum parole eligibility date for a person with a life sentence. (§ 3046, subd. (a)(1); *People v. Jefferson* (1999) 21 Cal.4th 86, 96.) Appellant's sentence for attempted murder, before application of the Three Strikes law and the applicable enhancements, should have been life, rather than the nine years to life imposed by the trial court. (*People v. Felix* (2000) 22 Cal.4th 651, 657.)

11

Appellant next contends the trial court also improperly made dual use of the section 12022.53, subdivision (d) enhancement for personal use of a firearm causing great bodily injury. We are not persuaded. The trial court correctly included the 25-year enhancement term mandated by section 12022.53 in calculating the minimum term of appellant's indeterminate sentence. (*People v. Williams* (2004) 34 Cal.4th 397, 403; *People v. Acosta* (2002) 29 Cal.4th 105, 108.) It also correctly imposed an additional and consecutive term of 25 years to life for the section 12022.53 enhancement itself. (§ 667, subd. (e)(2)(B); § 12022.53, subd. (d).)

Appellant is a third strike offender. As a consequence, the trial court was required to use the Three Strikes Law to calculate his sentence. Subdivision (e) of section 667 provides that the term for appellant's current attempted murder conviction "shall be an indeterminate term of life imprisonment," with the "minimum term of the indeterminate sentence" being the greatest of the three options described in subdivision (e)(2)(A). (*People v. Acosta, supra,* 29 Cal.4th at p. 108.) These options are: (i) three times the term otherwise provided as punishment for attempted murder, not including enhancements; (ii) 25 years; or (iii) "[t]he term determined by the court pursuant to Section 1170 for the underlying conviction, including any enhancement applicable under Chapter 4.5 (commencing with Section 1170) of Title 7 of Part 2, or any period prescribed by Section 190 or 3046." (*People v. Williams, supra,* 34 Cal.4th at p. 403; § 667, subd. (e)(2)(A). ) The trial court here employed option 3 which, it correctly concluded, yields the longest sentence.

The minimum term calculated under option 3 includes the term for the current felony plus "any applicable enhancement that would be used to lengthen the term the defendant would receive absent the Three Strikes Law." (*People v. Acosta, supra,* 29 Cal.4th at p. 115.) An enhancement imposed under section 12022.53, subdivision (d) lengthens the term appellant would receive for attempted murder absent the Three Strikes Law. Thus, the minimum term of appellant's indeterminate life sentence under option 3 is 32 years, composed of 7 years under section 3046 plus 25 years under section 12022.53, subdivision (d).

The trial court also properly imposed an additional, consecutive enhancement term of 25 years under section 12022.53, subdivision (d), for a total sentence of 57 years to life. (§§ 667, subd. (e)(2)(B); 12022.53, subd. (d); *People v. Williams*, supra, 34 Cal.4th at p. 403; *People v. Miranda* (2011) 192 Cal.App.4th 398, 417.) As the court explained in *Williams:* "In third strike cases, the Three Strikes Law uses enhancements in two distinct ways: to calculate the minimum term of the indeterminate life sentence and to add an additional, determinate term to be served before the indeterminate life sentence . . . ." (*People v. Williams, supra,* 34 Cal.4th at p. 403.) The Three Strikes Law requires that a third-strike defendant's indeterminate life sentence "shall be served consecutive to any other term of imprisonment for which a consecutive term may be imposed by law[,]" (§ 667, subd. (e)(2)(B)), and shall be "in addition to any other enhancement or punishment provisions which may apply[.]" (§ 667, subd. (e).) These provisions apply "whether or not the minimum term was established under option three." (*People v. Williams, supra,* 34 Cal.4th at p. 403.) As a consequence, the enhancement term is imposed consecutive to the minimum term of the indeterminate life sentence, even where the minimum term of the life sentence is calculated by adding in the enhancement term under option three of section 667, subdivision (e)(2)(A). (*Id.*; see also *People v. Dotson* (1997) 16 Cal.4th 547, 553.) There was no improper dual use of the firearm enhancement.

### *Disposition*

We modify appellant's sentence as follows: As to count 1 (attempted murder), appellant is sentenced to a term in state prison of 32 years to life (§ 667, subd. (e)(2)(A)(iii)), plus a consecutive sentence enhancement term of 25 years to life. (§ 12022.53, subd. (d).) Execution of the sentence imposed on counts 2, 3, 5, 6 and 7 (including any accompanying enhancement terms) is stayed pursuant to section 654. The stay shall become permanent upon completion of the service of sentence on counts 1 (attempted murder of Juan Ortiz Aguilar) and 4 (attempted second degree robbery of Maria Aguilar). As so modified, the judgment is affirmed. The trial court is directed to

prepare an amended abstract of judgment and to transmit a certified copy of it to the Department of Corrections and Rehabilitation.

<u>NOT TO BE PUBLISHED.</u>


YEGAN, J.


We concur:



GILBERT, P.J.



PERREN, J.

Frank Ochoa, Judge

Superior Court County of Santa Barbara

_____

Gilbertt W. Lentz, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, Rama R. Maline, Deputy Attorney General, for Plaintiff and Respondent.